# United States District Court

## For The District of Wyoming

KEEP YELLOWSTONE NUCLEAR )
FREE, ENVIRONMENTAL DEFENSE )
INSTITUTE, and DAVID McCOY, )
)
      Plaintiffs, )      Case No. 06-CV-205-D
)
vs. )

THE UNITED STATES DEPARTMENT
OF ENERGY and SAMUEL W.
BODMAN, SECRETARY, UNITED
STATES DEPARTMENT OF ENERGY,

      Defendants.

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on cross-motions for summary judgment.

The Court having considered the motions, having heard oral argument, and being

otherwise fully advised in the premises, hereby FINDS and ORDERS as follows:

### BACKGROUND

This case is brought pursuant to the of Freedom of Information Act ("FOIA"), 5

U.S.C. § 552, and involves several requests submitted to the United States Department

of Energy ("DOE") Idaho Operations Office ("IOO"),  seeking information related to the

Advanced Test Reactor ("ATR") located at DOE's Idaho National Laboratory ("INL").

The INL facility is located in southeastern Idaho, and the ATR is one of three reactors

operating at the INL.  The ATR is the largest and most powerful nuclear test reactor in

the world. The ATR was designed in the 1950s, and began operation in 1967.  It is

currently in its 40th year of operation.  The ATR is a government-owned and

contractor-operated facility.  It is managed by DOE's IOO, under the direction of DOE's

Office of Nuclear Energy, and operated under contract by Battelle Energy Alliance, LLC

("BEA").

According to Plaintiffs, the ATR is "well beyond its design life expectancy and has

suffered badly from many years of what the DOE itself describes as 'budget austerity.'"

Plaintiffs claim that "[w]ith seismic vulnerabilities both known and unknown, aging and

suspect safety systems, and no containment dome, the ATR poses a threat to the

residents of southeastern Idaho and western Wyoming and two of the nation's most

cherished national parks, Yellowstone National Park and Grand Teton National Park."

Plaintiffs contend that the withheld documents "describe safety shortcomings and the

consequences of an accident at the [ATR]" of which the public has a right to know.

The three FOIA requests at issue in this case were made between July 7, 2005

and October 20, 2005.  As a result of the requests, the DOE released some responsive

documents in full, some with portions redacted, and others were withheld in their

entirety. Plaintiffs appealed the decisions to withhold these materials with the DOE's

Office of Hearings and Appeals ("OHA").  The decisions of the DOE were largely upheld

on appeal, however, some additional documents or portions thereof were released to

Plaintiffs as a result of the administrative appeal process.

Over the course of this litigation, the category of documents remaining in dispute

has been further narrowed at the behest of the parties.  On April 29, 2007, the DOE filed

a Notice of Voluntary Disclosure indicating that documents previously withheld under

Exemption 5 were being disclosed to Plaintiffs.   Additionally, as a result of briefing on

the motions for summary judgment and with the benefit of additional information

regarding the contents of documents withheld under Exemptions 2 and 7, Plaintiffs have

narrowed their demand to include only what they have termed the "Accident Scenario

Documents."  Currently, only the following documents remain in dispute:

> 1) **Chapter 15 of the Current Upgraded Final Safety Analysis Report (UFSAR)**: This chapter of the UFSAR provides detailed descriptions of accident scenarios and the effects on the reactor.  It includes addenda to the SAR developed to resolve unreviewed safety questions. Supp. Trent Decl. at ¶ 2a; Trent Decl. at ¶ 15a;

> 2) **Chapter 15 of the 1998 UFSAR**: This chapter of the 1998 UFSAR provides detailed descriptions of accident scenarios and the effect on the reactor. Supp. Trent Decl. at ¶ 2a;

> 3) **The HAD-3 Emergency Management Hazards Assessment Document**: This document contains numerous accident scenarios along with their respective dose consequences. Trent Decl. at ¶ 15f;

> 4) **Engineering Design File 4394 Update of ATR Break Spectrum and Direct Damage LOCA Frequency Analyses**: This document is an engineering design study to determine if any additional ATR piping is susceptible to direct damage Loss of Coolant Accidents ("LOCAs") than is

currently assumed. Supp. Trent Decl. at ¶ 2c.

### STANDARD OF REVIEW

When an action is brought under FOIA to obtain information in the possession of a government agency, the district court must review the agency's decision to withhold the requested materials *de novo*. *Anderson v. Department of Health and Human Services*, 907 F.2d 936, 941 (10th Cir. 1990). In a FOIA case, the agency has the burden of justifying nondisclosure. 5 U.S.C. § 552(a)(4)(B). It may sustain its burden by submitting detailed affidavits or declarations that identify the withheld documents and explain how the documents fall within the claimed exemptions.

### DISCUSSION

The Freedom of Information Act was enacted to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dept of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (quoting *Rose* 495 F.2d 261, 263 (2d Cir. 1974)). The enactment of FOIA represents "a general philosophy of full agency disclosure." That philosophy, put into practice, helps "ensure an informed citizenry, vital to the functioning of a democratic society." *Dept. of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 16 (2001) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). This right of access to federal agency records is subject to nine clearly delineated exemptions. *See* 5 U.S.C. § 552(b). "Congress created these exemptions

because it realized that legitimate governmental and private interests could be harmed

by release of certain types of information." *Casad v.U.S. Dept. of Health and Human*

*Services*, 301 F.3d 1247, 1251 (10th Cir. 2002) (quoting *United States Dept. of Justice*

*v. Julian*, 486 U.S. 1, 8 (1988)).  "Recognizing past abuses, Congress sought to reach a

workable balance between the right of the public to know and the need of the

Government to keep information in confidence to the extent necessary without

permitting indiscriminate secrecy." *John Doe Agency v. John Doe Corporation*, 493

U.S. 146, 152 (1989) (citations and quotations omitted).  The Act's broad principle

favoring public access to Government documents, coupled with the specific exemptions,

"reveal and present the 'balance' Congress has struck." *John Doe Agency*, 493 U.S. at

153.

At issue in this case is the application of FOIA's Exemptions 2 and 7 to the

documents withheld by the DOE.[1]

*Exemption 2 - Internal Personnel Rules and Practices*

Exemption 2 exempts from disclosure documents that are "related solely to the

internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).  Defendants

---

[1]Defendants assert Exemptions 2 and 7 as a basis for withholding the remaining documents.  While the DOE did not invoke Exemption 7 at the administrative level, its failure to do so does not effect a waiver of that Exemption.  Because FOIA requires *de novo* review of agency action, an agency may raise an exemption for the first time in the district court.  *See* 5 U.S.C. § 552(a)(4)(B) (providing for de novo review of agency decisions); *Living Rivers, Inc. v. U.S. Bureau of Reclamation*, 272 F.Supp.2d 1313, 1318 (D. Utah 2003); *Young v. CIA*, 972 F.2d 536, 538-39 (4th Cir. 1992).

urge this Court to apply the "high 2" interpretation of the exemption and to find that

because the documents contain instructions and practices for agency personnel to

follow, they are properly withheld under Exemption 2.  Under the "high 2" interpretation

of Exemption 2, government information is exempt if 1) the information relates to the

"internal personnel rules and practices" of the agency and is "predominantly internal;"

and 2) its disclosure would risk circumvention of federal statutes or regulations."

*Audobon Society v. Forest Service*, 104 F.3d 1201, 1203 (10th Cir. 1997).

　　While the Tenth Circuit discussed the "high 2" interpretation of Exemption 2 in

*Audobon Society*, it did not adopt it in that case.  Instead, the Tenth Circuit noted that

before the court reaches the "circumvention prong" of a high 2 analysis, it must first

determine whether the documents fall within the terms of the statutory language.

*Audobon Society*, 104 F.3d at 1204.  Thus, in order for the exemption to apply at all, the

court must first determine that the document is related to the internal personnel rules or

internal personnel practices of an agency.   *Audobon Society*, 104 F.3d at 1204.

　　In *Audobon Society*, the Forest Service argued that maps of owl nesting

locations were "related to Forest Service practices" because they were used to assist

agency personnel in their management duties.  The Tenth Circuit rejected the agency's

argument, concluding that such an interpretation "stretch[ed] the language of the

exemption too far" and raised concerns that when read too broadly, such an exemption

would undercut the spirit of disclosure embodied by FOIA and cover virtually all material

published by the Forest Service.  Quoting Judge Leventhal in *Vaughn v. Rosen*, 523

F.2d 1136, 1150 (D.C. Cir. 1975), the Court noted:

> In some attenuated sense, virtually everything that goes on in the Federal
> Government, and much that goes on outside of it, could be said to be
> "related" through some chain of circumstances to the "internal personnel
> rules and practices of an agency."  The potentially all-encompassing
> sweep of a broad exemption of this type would undercut the vitality of such
> approach.

*Audobon Society*, 104 F.3d at 1204 (quoting *Vaughn* at 1150 ((Leventhal, J.

concurring)).

Likewise, the application urged by Defendants in this case goes far beyond both

any logical reading of the statute as well as the exemption's original intent. As noted by

the Supreme Court, the original purpose of Exemption 2 was "to relieve agencies of the

burden of assembling and maintaining for public inspection matters in which the public

could not reasonably be expected to have an interest."  *Rose*, 425 U.S. at 369-70.

Accordingly, it protects from disclosure those documents that are "related solely to the

*internal personnel* rules and practices of an agency." 5 U.S.C. § 552(b)(2) (emphasis

added).

Here, the majority of accident scenario documents at issue were compiled

pursuant to a regulatory mandate requiring the contractor that operates the ATR to

"establish and maintain the safety basis for the facility" and to "prepare a documented

safety analysis for the facility."  10 C.F.R. Part 830.  Defendants argue that the

documents nonetheless fit within the meaning of Exemption 2 because they contain

instructions and practices for ATR operations personnel to follow in operating the

reactor within its safety envelope and in implementing emergency response actions.

According to Defendants, they contain specific operator actions for responding to, and

mitigating, various accident scenarios.  Trent Decl. At ¶¶ 11, 12, 15, 21.

To accept this argument would be to endorse the all-encompassing sweep of an

exemption like Exemption 2.  What is at issue in this case are documents designed to

establish and discuss the safety of the ATR and its continued operation.  Like the Tenth

Circuit in *Audobon Society*, because this Court finds that the documents are not

"sufficiently related to internal personnel rules and practices" so as to fall within the

terms of the Exemption 2 statutory language, it need not reach the issue of whether it is

appropriate to adopt the "high 2" analysis urged by Defendants.

*Exemption 7 - Law Enforcement Records or Information*

Exemption 7(F) exempts from disclosure "records or information compiled for law

enforcement purposes, but only to the extent that the production of such law

enforcement records or information . . . could reasonably be expected to endanger the

life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).  In order to establish

the threshold requirement under Exemption 7 that information was "compiled for law

enforcement purposes," an agency such as the DOE that has both law enforcement and

administrative functions, must demonstrate that its purpose in compiling the information

fell within its sphere of enforcement authority. *Church of Scientology v. Dept. of Army*, 611 F.2d 738, 748 (9th Cir. 1978). The context in which the agency has *currently* compiled and used the records, rather than the purpose for which the records were *originally* created, determines whether they are "compiled for law enforcement purposes." *John Doe Agency*, 493 U.S. at 153-54; *KTVY-TV v. United States*, 919 F.2d 1465, 1469 (10th Cir. 1990), *abrogated on other grounds as recognized by Rosenfeld v. DOJ*, 57 F.3d 803, 814 (9th Cir. 1995). In determining whether an exemption has been properly invoked by the Government, the Court looks to the reasons for the exemption and the effect that disclosure would have on the interest the exemption seeks to protect. *John Doe Agency*, 493 U.S. at 157. As the Supreme Court has cautioned, "[t]he statutory provision that records or information must be 'compiled for law enforcement purposes' is not to be construed in a nonfunctional way."

As discussed above, the accident scenario documents at issue were originally compiled by BEA, the contractor that operates the ATR, to comply with DOE's Safety Basis Requirements. DOE has issued Safety Basis Requirements that require contractors responsible for operating a hazard category 1, 2 or 3 DOE nuclear facility to analyze the facility, the work to be performed, and the associated hazards, and to identify the conditions, safe boundaries, and hazard controls necessary to protect workers, the public and the environment from adverse consequences. 10 C.F.R. § 830.202. These analyses and hazard controls constitute the safety basis upon which

the contractor and DOE rely to conclude that the facility can be operated safely and

securely. *Id.*

Defendants argue that Exemption 7 applies to the withheld documents because

they have been compiled by DOE as part of its law enforcement authority to maintain

the safety, security, protection and defense of its nuclear facilities and nuclear materials.

In other words, the DOE uses the current and 1998 UFSAR, which were unquestionably

originally compiled to demonstrate the safety basis of the ATR, to protect the ATR from

potential malfeasants. The potential use of the redacted information by terrorists was

described by the DOE's declarant as follows:

> The easiest way to determine how to damage a reactor is to look at the
> safety envelope and accident analysis for the reactor, and then to
> determine the best way to bypass or defeat the engineered safeguards
> that can cause a small accident, and to make that small accident bigger.
> Because of the need to demonstrate safety, most of the work has already
> been done for a terrorist if such safety information were to be released.
> The Safety Analysis Report and related documents at issue in this
> litigation (referred to collectively as the "SAR") contain details regarding
> the operation of the reactor and the engineered safety features and
> procedures used to mitigate accidents. In other words, the SAR, due to its
> safety analysis, contains everything a terrorist needs – the safety
> envelope, the accident analysis, and the engineered safeguards that can
> be bypassed to cause a small accident, and those that can be bypassed
> to make the small accident bigger.

Trent Dec. at ¶ 17.

Central to Defendants' argument is a Utah District Court decision, *Living Rivers v.

U.S. Bureau of Reclamation*, 272 F.Supp.2d 1313 (D. Utah 2003). In that case, the

court upheld withholding of inundation maps of the Hoover and Glen Canyon Dam,

finding that the maps were exempt under Exemption 7(F) because the maps were used

pursuant to the Bureau's law enforcement authority to develop Emergency Action Plans

to protect and alert potentially threatened people in the vicinity of the dams.  *Living*

*Rivers,* 272 F.Supp.2d at 1318-20.  Finding that the maps could be used by terrorists in

carrying out an attack on the dams, the court concluded that the agency had met its

burden for withholding the maps under Exemption 7(F).  *Living Rivers*,  272 F.Supp.2d

at 1321-22.

Plaintiffs argue that Defendants' interpretation of Exemption 7 is simply too broad

and that the documents withheld constitute "routine internal audits" not covered by

Exemption 7.  Plaintiffs argue that *Living Rivers* is an aberrational decision that

represents a substantial broadening of Exemption 7(F) and departs from the

"well-established and fundamental precepts that FOIA favors disclosure and that FOIA

exemptions are to be construed narrowly."  Pl. Brief at 19.  With due respect for the

district court in *Living Rivers* and recognition of the context in which the case was

decided, this Court must agree.

In 1986, Congress amended the exemption from "investigatory records compiled

for law enforcement purposes" to "records or information compiled for law enforcement

purposes," deleting any express requirement that the information be "investigatory" in

nature.  *Tax Analysts v. Internal Revenue Service,* 294 F.3d 71, 79 (D.C. Cir. 2002);

Anti-Drug Abuse Act of 1986, § 1802(a), Pub. L. No. 99-570, 100 Stat. 3207, 3207-48

(1986) (amending 5 U.S.C. § 552(b)(7)).  As the legislative history makes clear,

"Congress intended the amended exemption to protect both investigatory and non-

investigatory materials, including law enforcement manuals and the like."  *Tax Analysts*,

294 F.3d at 79 (citing S.REP. NO. 98-221, at 23 (1983) (expressing intent to protect

"sensitive non-investigative law enforcement materials, including law enforcement

manuals and similar documents)). Nonetheless, this broadening did not take away the

exemption's primary application in the investigatory and enforcement context.  *See*

*KTVY-TV*, 919 F.2d at 1468-69 (noting that exemption applies to "records or information

compiled for law enforcement purposes" but holding that "threshold question in

determining whether [exemption 7] applies is whether the materials in question are

*investigatory* records or information compiled for law enforcement purposes") (emphasis

added).

In *Living Rivers*, the BOR argued that inundation maps for areas below dams

were exempt from disclosure under 7(f).  The BOR argued that the maps were used

pursuant to its statutory law enforcement mandate and if released,  could compromise

dam security if the maps "fell into the hands of a terrorist or other person intending to

harm one or more of the Colorado River dams."  *Living Rivers*, 272 F.Supp.2d at 1315-

1316.  The *Living Rivers* court agreed and applied Exemption 7(F) in a decision which

Plaintiffs claim is an aberrational broadening of the exemption.

The justification for withholding the accident scenario documents under

Exemption 7(F) is strikingly similar in this case.  Defendants concede that the

documents at issue were originally compiled to demonstrate the safety basis for

operations of the ATR, but they argue that because they are used by DOE law

enforcement and security officials "to determine physical protection requirements and

strategies for the ATR, and to establish emergency plans and potential protective

actions that may be taken for those scenarios" they "support DOE's law enforcement

mission of securing and protecting the ATR.  *See* Trent Decl. at ¶¶ 13-14; Supp. Trent

Decl. at ¶¶ 2-4.

Plaintiffs argue that such an application would unduly expand the scope of

Exemption 7(F) because "it is virtually certain that almost every document prepared by

the DOE and its contractor for purpose of evaluating the ATR's safety is utilized in some

fashion by the DOE Security in performing its emergency planning functions."  Pl. Brief

at 18.  The DOE responds by stating that "contrary to Plaintiffs' baseless assumption,

there are hundreds of safety-related documents on the ATR that DOE's Security

function does not use in emergency planning."  Def. Opposition at 15.  Nonetheless, the

absence of these "hundreds of safety-related documents" appears to be more a function

of the comprehensive nature of the accident scenario documents at issue than of any

altruistic effort by the DOE to limit withholding.  Def. Opposition at 15 (noting that the

documents at issue "contain all the information that is needed to evaluate the design

basis threat and develop response plans").  The fact remains that the additional safety-related documents *could be* used to perform the agency's security and emergency planning functions, and under the DOE's logic, such use would render them exempt from disclosure. Such a result would be absurd in light of the legislative history behind early amendments to the exemption.  *See John Doe Agency*, 493 U.S. at 156 (noting that 1974 amendment changing language from investigatory "files" to investigatory "records" resulted from Congressional fear "that agencies would use that rule to commingle otherwise nonexempt materials with exempt materials" and claim protection from disclosure for all the contents).

It is not surprising to the Court that the apparent broadening of Exemption 7(F) now urged by Defendants developed largely in response to perceived terrorist threats. On September 11, 2001, much to our horror, this nation observed first-hand the very real possibility that our own engineering and technological achievements could be turned against us and used as weapons of mass destruction.  The Court has no doubt that the threat of a terrorist attack aimed at this nation's nuclear facilities is a real one. Nonetheless, as eloquently stated by District Judge Hellerstein in *ACLU v. Department of Defense*, 389 F.Supp.2d 547, 577 (S.D.N.Y. 2005), this court's task "is not to defer to our worst fears, but to interpret and apply the law, in this case, the Freedom of Information Act, which advances values important to our society, transparency and accountability in government."

To be sure, in this case, the Court is faced with the burden of balancing weighty considerations. The Court is mindful that disclosure of highly specific information regarding the ATR has the potential to circumvent the security and safety measures designed to protect the ATR from attack. On the other hand, blocking public access to information necessary to critically assess the ATR's safety runs the risk that government decisions to extend the life of the ATR will go unchecked, with the possibility of a devastating nuclear accident 100-miles from Yellowstone and Grand Teton National Parks, crown jewels of this country's national parks. For obvious reasons, both possibilities, whether real or remote, are unsettling to the Court.

While the Court's assessment is that a broad interpretation of Exemption 7 cannot stand as a basis for withholding the accident scenario documents currently at issue, in light of the weighty considerations before the Court, the Court believes it prudent to err on the side of caution. Accordingly, the Court orders that the withheld documents be made available to the Court for *in camera* production. Obviously, the Court is mindful that the documents at issue contain highly specialized technical information outside the substantive knowledge of the Court. Accordingly, Defendants will be required to provide an expert who can assist the Court in determining if the withheld documents fall within a more narrow construction of Exemption 7(F) and whether there are details (for example, the exact locations of certain systems or equipment and their identifiers) that can be redacted before the documents are

produced.

**IT IS SO ORDERED.**

DATED this   24th   day of September, 2007.


_____

UNITED STATES DISTRICT JUDGE